UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **INNOVATION VENTURES, LLC** ) | |
| **d/b/a LIVING ESSENTIALS,** ) | |
| a Michigan limited liability ) | Civil Action No. 2:08-CV-12711-GER-SDP |
| ) | |
| Plaintiff / Counterclaim Defendant, ) | Honorable Gerald E. Rosen |
| ) | Magistrate Judge Steven D. Pepe |
| vs. ) | |
| ) | |
| **BODY DYNAMICS, INC.** ) | |
| **d/b/a BDI MARKETING** ) | |
| an Indiana corporation, ) | |
| ) | |
| Defendant / Counterclaimant. ) | |

_____

| | |
|---|---|
| J. Michael Huget - P39150 | Dean E. McConnell |
| Deborah J. Swedlow - P67844 | Scott S. Morrisson |
| **BUTZEL LONG** | **KRIEG DEVAULT LLP** |
| 350 South Main Street, Suite 300 | One Indiana Square, Suite 2800 |
| Ann Arbor, Michigan 48104 | Indianapolis, Indiana 46204 |
| | |
| Telephone: (734) 213-3110 | Telephone: (317) 636-4341 |
| Facsimile: (734) 995-1777 | Facsimile: (317) 636-1507 |

*Attorneys for Defendant / Counterclaimant*

_____

**BDI MARKETING'S RESPONSE TO PLAINTIFF'S OBJECTIONS TO
MAGISTRATE'S REPORT AND RECOMMENDATION**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................. ii

I.      INTRODUCTION ..................................................................................... 1

II.     BACKGROUND ...................................................................................... 2

III.    ARGUMENT ........................................................................................... 6

        **A.**  A Preliminary Injunction is Appropriate and Not Moot ............................ 6

        **B.**  The Magistrate's R&R is not Extraordinary and a Hearing is not Required
              By Local Rule ...................................................................................... 7

        **C.**  A Preliminary Injunction is Warranted ..................................................... 7

        **D.**  Bond ................................................................................................... 20

IV.     CONCLUSION ...................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

**Cases**

*American Council of Certified Podiatric Physicians and Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999) ............................................. 8

*Balance Dynamics Corp. v. Schmitt Indus. Inc.*, 204 F.3d 683, 689 (6th Cir. 2000) .................... 8

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)......................................................................................................... 8

*Estate of Presley v. Russen*, 513 F. Supp. 1339, 1382 (D. N.J. 1981) ......................................... 19

*Janda v. Riley-Meggs Indus., Inc.*, 764 F. Supp. 1223, 1229 (E.D. Mich. 1991) ........................ 17

*Lehnert v. Ferris Faculty Ass'n-MEA-NEA*, 556 F.Supp. 309, 312-313 (W.D. Mich. 1982)......................................................................................................................... 6

*Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006) ................................................................................................................ 17, 18, 19

*Mexican Food Specialties Inc. v. Festida Foods Ltd.*, 953 F. Supp. 846, 854 (E.D. Mich. 1997)........................................................................................................................ 17

*Novartis Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharma. Co.*, 290 F.3d 578 (3rd Cir. 2002) ............................................................................... 12

*Time Warner Cable Inc. v. DirectTV Inc.*, 497 F.3d 144, 161-162 (2d Cir. 2007)....................... 17

*Wynn Oil Co. v. American Way Serv. Corp.* 943 F.2d 595, 608 (6th Cir. 1991).......................... 18

**Statutes**

15 U.S.C. § 1114.............................................................................................................. 3

15 U.S.C. § 1125(a) .................................................................................................... 4, 6

**Rules**

E.D. Mich. L.R. 7.1(e)(2)...................................................................................................7

## ISSUE PRESENTED

Should the Magistrate's October 28, 2008 Report and Recommendation that this Court grant Body Dynamics, Inc.'s request for the issuance of a preliminary injunction be confirmed?

Answer: Yes

## I.     <u>INTRODUCTION</u>

On October 28, 2008, the Honorable Magistrate Steven D. Pepe issued a Report and Recommendation ("R&R") recommending that this Court grant Body Dynamics, Inc.'s d/b/a BDI Marketing (hereinafter "BDI") request for the issuance of a preliminary injunction.  On November 12, 2008, Innovation Ventures, LLC d/b/a Living Essentials (hereinafter "Living Essentials") filed its objections to Magistrate Pepe's R&R.  For the reasons set forth below, this Court should adopt the R&R in its entirety and issue a preliminary injunction against Living Essentials.

Living Essentials only has itself to blame for the present situation.  As the Magistrate found, Living Essentials misused and misrepresented to the public the scope and holding of the preliminary injunction order Living Essentials obtained in an unrelated case not involving BDI or BDI's products to create the false impression that BDI's products were the subject of a court ordered recall.  As set forth in the R&R, Living Essentials obtained a preliminary injunction for its **trade dress infringement claim** against N2G Distributing Inc. and Alpha Performance Labs (collectively referred to as "N2G").  *See* Exhibit A, R&R, Page 3.  The Court, however, did not enjoin N2G from using the highly descriptive phrase "6 Hour Energy Shot" in connection with its energy shot  *Id*.  Yet the communications made by Living Essentials purposefully obscured that critical distinction.

It is readily apparent why Living Essentials issued the ambiguously vague, false and misleading advertisements and letters to the trade (collectively the "False Advertisements").  *See* Exhibit B, False Advertisements.  Living Essentials used the False Advertisements as an economic weapon against competitors in the "6 Hour" energy shot category to disrupt their

business.  The False Advertisements were so vague and broad that other companies were also impacted.[1]

Living Essentials' succeeded in substantially disrupting BDI's business, in tarnishing BDI's goodwill and name in the industry, and in falsely associating BDI's MINI THIN RUSH® product with a "recall" that has tarnished and continues to tarnish the product's image.  It would have been a simple matter for Living Essentials to issue clear and truthful communication to the trade about the injunction issued in the N2G case, but for economic reasons Living Essentials chose not to do so.

As Magistrate Pepe's R&R properly held, a preliminary injunction is the proper remedy to prevent Living Essentials from causing further economic harm to BDI and from otherwise unfairly competing with BDI.

## II.    BACKGROUND

Since at least as early as September 28, 2007, BDI began marketing, promoting, selling, and offering for sale certain dietary supplements formulated as an energy booster under the MINI THIN RUSH® Trademark.  *See* Exhibit E, King Declaration, ¶ 3.  The MINI THIN RUSH® dietary supplement is sold by BDI in a liquid, capsule, and chewing gum form.  *Id.* The MINI THIN RUSH® liquid and capsule energy boosters are designed to provide the body with up to six (6) hours of energy.  *Id.*

---

[1] The False Advertisements, for example, create the false impression that BDI's "6 Hour" energy shot was the subject of a court ordered recall.  They also created the false impression that N.V.E.'s 6 HOUR POWER! energy shot, another energy shot in the "6 Hour" category, was the subject of a court ordered recall prompting N.V.E. to take action to keep its products on the shelves as well as filing a lawsuit against Living Essentials alleging, amongst other things, claims of false and misleading advertising.  *See* Exhibit C and Exhibit D, Innovation Ventures, LLC d/b/a Living Essentials v. N.V.E., Inc., 2:08-cv-13859-PDB-VMM, Docket Entry 1, Complaint.

The MINI THIN RUSH® liquid and capsule energy boosters contain the highly descriptive phrase "6 Hour Energy!" at the top of the label. *See* Exhibit E, King Declaration, ¶ 4, Exhibit A. This highly descriptive phrase is used to describe a characteristic, function, feature, purpose and use of the energy boosters. *Id.* As such, the MINI THIN RUSH® energy shot falls under the "6 Hour" energy shot category, as do other energy shots on the market. Brokers and retailers of energy shot products have come to recognize different categories of energy shots based on the length of time that a product provides an energy boost following consumption. *See* Exhibit F, King Declaration, ¶ 2, Exhibit 1. The term "shot" is a commonly used term in the energy drink industry to refer to a smaller, higher powered energy drink containing more active ingredients, that is typically sold in a 2 or 2.5 ounce bottle. *See* Exhibit E, King Declaration, ¶ 6. Energy shots are designed to be consumed in seconds, as opposed to canned energy drinks that typically require the individual to force down a lot of liquid to feel the same affect as that provided by the smaller energy shot. *Id.*

Living Essentials also sells an energy drink in the form of a shot that is also designed to provide the body with an energy boost. *See* Exhibit G. As Living Essentials' product description on its website states: "We named it 5-Hour Energy for a reason. People typically feel an elevated sense of energy, focus and alertness for about five hours." *Id.* As such, Living Essentials' dietary supplement is designed to provide energy for about five (5) hours and thus, falls under the "5 Hour" energy shot category.

On March 7, 2008, Living Essentials filed a Complaint with this Court against N2G. *See* Case No. 2:08-cv-10983-PDB-MJH, Document 1. Living Essentials' Complaint against N2G alleged that N2G was committing federal trademark infringement and counterfeiting under 15 U.S.C. § 1114, false designation of origin or sponsorship, false advertising, and trade dress

3

infringement under 15 U.S.C. § 1125(a), and common law trademark infringement. *Id*. In the Complaint, Living Essentials' alleged that N2G was infringing its alleged rights in the highly descriptive phrase "5 hour energy" through N2G's use of the highly descriptive phrase "6 hour energy", as well as the highly similar trade dress aspects of N2G's bottle packaging or label. *Id*.

On March 13, 2008, Living Essentials filed a Motion for Temporary Restraining Order and Preliminary Injunction against N2G for its alleged acts of trademark and trade dress infringement. *See* Case No. 2:08-cv-10983-PDB-MJH, Document 4. On April 9, 2008, this Court issued a Preliminary Injunction and Recall Order granting in part and denying in part Living Essentials' request for a preliminary injunction against N2G. *See* Case No. 2:08-cv-10983-PDB-MJH, Document 26. As noted above, this Court granted Living Essentials' request for a preliminary injunction with respect to its **trade dress infringement claim**, finding that N2G's **bottle label** was remarkably similar with the exact same color scheme, font, and depiction of a silhouetted figure ascending a mountain, etc. *Id*. Yet, this Court specifically denied Living Essentials' request for a preliminary injunction with respect to its trademark infringement claim in connection with the highly descriptive phrase "6 Hour Energy Shot."

In the Opinion Granting Plaintiff's Motion for a Preliminary Injunction issued by this Court on April 14, 2008, the Honorable Paul D. Borman denied the request for a preliminary injunction as to the phrase "6 Hour Energy Shot," finding that:

> Given the fact that "5 Hour Energy" is highly descriptive, the Court finds that Plaintiff has not carried its "heavy burden," at this point in the case, to demonstrate that the primary significance of "5 Hour Energy" is to "identify the source of the product rather than the product itself." Furthermore, Defendants have produced a variety of competing two-ounce energy drink products from different manufacturers that use phrases such as "7 Hour Energy Boost," "6 Hour Energy!," "Extreme Energy Six Hour Shot," and "6 Hour Power" - thus diluting Plaintiff's potential claim that "5 Hour Energy" has a strong secondary meaning that particularly identifies its source.

4

Therefore, the Court does not find that at this point in the case Plaintiff has demonstrated a "strong likelihood of success" on its trademark claim to support a preliminary injunction.

*See* Case No. 2:08-cv-10983-PDB-MJH, Document 28, Page 8.

Nevertheless, shortly after this Court enjoined N2G from using the trade dress that was found to be confusingly similar to Living Essentials' 5 Hour Energy trade dress, Living Essentials issued False Advertisements entitled "RECALL OF '6 HOUR' SHOT ORDERED." *See* Exhibit B. The False Advertisements did not identify the manufacturer of the enjoined product, did not specifically identify the product, did not provide UPC codes associated with the enjoined product, and did not illustrate the enjoined trade dress, but rather, referred to the enjoined product vaguely and ambiguously as the "6 Hour" product so that individuals who saw the False Advertisements would assume BDI's products (and others) were covered by the recall. *See* Exhibit B. Even Living Essentials' own employee now admits in hindsight that the False Advertisements could have been more clear. Deposition of Lynn Petersmarck, Pages 89-91, 98.

The False Advertisements state, in relevant part:

### RECALL OF "6 HOUR" SHOT ORDERED
*Court orders immediate stop to manufacturing, distributing and sale of 6 Hour Energy shot.*

We are pleased to announce that we won a decision against a "6 Hour" energy shot that closely mimicked 5-Hour Energy®. The United States District Court, in Case No. 08-CV-10983, issued a preliminary injunction ordering the immediate recall of all the "6 Hour" product, and told its manufacturer to stop making, distributing and selling it.

If you have any of the "6 Hour" energy shots in your store(s) or warehouse(s) contact the product's manufacturer or your distributor to return the product immediately.

The False Advertisements go on to, in essence, promote the sale of Living Essentials' products.

*See* Exhibit B.

As a result of Living Essentials' False Advertisements, numerous brokers and distributors of BDI's MINI THIN RUSH® products contacted BDI about returning BDI's MINI THIN RUSH® products. *See* Exhibit G, Declarations of Nine BDI Brokers. In addition, customers of BDI contacted BDI's brokers and distributors about returning BDI's MINI THIN RUSH® products. *Id.* As a result of Living Essentials' False Advertisements, BDI has lost sales of BDI's MINI THIN RUSH® products. *See* Exhibit E, King Declaration, ¶ 13; Exhibit F, King Declaration ¶ 7.

## III.   ARGUMENT

This is a straightforward case of false advertising under the Lanham Act. *See* 15 U.S.C. § 1125(a). Living Essentials has falsely, misleadingly and deceptively issued the False Advertisements in an attempt to unfairly compete with BDI as well as other energy shots that fall within the "6 Hour" category.

### A.   A Preliminary Injunction is Appropriate and Not Moot

Living Essentials' again incorrectly argues that the present issue is moot because it alleges that it does not "intend" to issue the False Advertisements anymore. This misses the point. As properly pointed out in the R&R, "[v]oluntary cessation of complained of conduct does not render a claim for injunctive relief moot." *Lehnert v. Ferris Faculty Ass'n-MEA-NEA*, 556 F.Supp. 309, 312-313 (W.D. Mich. 1982)[2]. Without issuance of the injunction, Magistrate Pepe correctly found that BDI does not have any assurance, other than Living Essentials' word, that the False Advertisements may not be reissued. All that has been established is a bare bones allegation that Living Essentials does not "intend" to issue the False Advertisements anymore,

---

[2] "Although a suit for injunctive relief may become moot if past challenged practices cannot recur, voluntary cessation does not render a claim moot. A party alleging mootness must clearly establish that the challenged conduct could not recur." *Lehnert v. Ferris Faculty Ass'n-MEA-NEA*, 556 F.Supp. 309, 312-313 (W.D. Mich. 1982)(internal citations omitted)

6

which does not clearly establish that the conduct could not occur again the future.  Furthermore, BDI also seeks an order that Living Essentials correct its False Advertisements in the market.

**B.    The Magistrate's R&R is not Extraordinary and a Hearing is not Required By Local Rule**

Magistrate Pepe issued the R&R without holding a hearing for obvious reasons. Magistrate Pepe conducted a thorough and careful study of both parties' pleadings and affidavit evidence and determined that Living Essentials' False Advertisements were in fact false and misleading.  Pursuant to E.D. Mich. L.R. 7.1(e)(2), this Court is entitled to grant the relief requested by BDI on the briefs and without a hearing.  *See e.g. A&B Steel Shearing & Processing, Inc. v. United States*, 174 F.R.D. 65 (E.D. Mich. 1997).  BDI agrees with Magistrate Pepe that a hearing was unnecessary because the facts and legal arguments were adequately presented in the parties' papers and the decision process would not have been significantly aided by a Hearing or oral arguments.  Living Essentials simply ignores that E.D. Mich. L.R. 7.1(e)(2) allows a decision without a Hearing.

**C.    A Preliminary Injunction is Warranted**

The Sixth Circuit has set forth the legal standard for evaluating motions for preliminary injunctions:

> When considering a motion for preliminary injunction, a district court must balance four factors:
>
> (1) whether the movant has a strong likelihood of success on the merits;
> (2) whether the movant would suffer irreparable injury without the injunction;
> (3) whether issuance of the injunction would cause substantial harm to others; and
> (4) whether the public interest would be served by issuance of the injunction.
>
> These four considerations are "factors to be balanced, not prerequisites that must be met."  The district judge "is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue."

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir.

2007) (internal citations omitted).  Because all of these factors favor issuance of an injunction,

BDI is entitled to the relief it requests.

> **1.      The Magistrate Properly Found That BDI Has a Strong Likelihood of
> Success on the Merits**

The R&R is correct in that BDI has a strong likelihood of success on the merits.  The

Sixth Circuit has established a five-element test for plaintiffs seeking to prove liability under the

Lanham Act for false advertising.  In order to prove liability, a plaintiff must establish the

following:

> (1)  the defendant has made false or misleading statements of fact concerning his
> own product or another's;
> (2)  the statement actually deceives or tends to deceive a substantial portion of the
> intended audience;
> (3)  the statement is material in that it will likely influence a deceived consumers'
> purchasing decisions;
> (4)  the advertisements were introduced into interstate commerce; and
> (5)  there is some causal link between the challenged statements and harm to the
> plaintiff.

*Balance Dynamics Corp. v. Schmitt Indus. Inc.*, 204 F.3d 683, 689 (6th Cir. 2000), citing

*American Council of  Certified Podiatric Physicians and Surgeons v. American Bd. of Podiatric*

*Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999).  All of the above-referenced factors are clearly

in BDI's favor and an injunction is warranted.

Moreover, "where statements are literally false, a violation may be established without

evidence that the statements actually misled consumers.  Actual deception is presumed."

*Podiatric Physicians*, 185 F.3d at 613.  In *Podiatric Physicians*, the Sixth Circuit also set forth a

more lenient standard for obtaining injunctive relief under the Lanham Act:  "injunctive relief

may be obtained by showing only that the defendant's representations about its product have a

tendency to deceive consumers ..."  *Id*. at 618 (emphasis added).  As such, for the purpose of the

present motion, BDI is entitled to injunctive relief by only showing that Living Essentials' representations "have a tendency to deceive."

Living Essentials argues that it was erroneous for Magistrate Pepe to consider BDI's counterclaim in a vacuum.  Yet, as Magistrate Pepe properly found, Living Essentials mistakenly conflates two separate issues.  BDI's counterclaim against Living Essentials has nothing to do with Living Essentials' claims against BDI.  As Magistrate Pepe properly pointed out in the R&R "[u]nless and until Living Essentials established that use of the phrase "6 Hour Energy!" on BDI's MINI THIN RUSH® product label infringes a valid trademark in Living Essentials' "5 HOUR ENERGY®", it is misleading for Living Essentials to represent that all energy products that have "6 Hour Energy!" on their label are subject to a federal court's recall order that was limited to N2G's "6 Hour Energy Shot"."  Further, N2G is not enjoined from using the phrase "6 Hour Energy Shot" but, rather, is enjoined from using the product label that infringed Living Essentials' trade dress.

### a.    Living Essentials Has Made False and Misleading Statements of Fact Concerning Another's Products

Living Essentials' False Advertisements are clearly false, deceptive and misleading.  *See* Exhibit B.  The False Advertisements falsely state that Living Essentials won a decision against a **"6 Hour"** energy shot, when in fact, they did not.  As set forth in the R&R, Living Essentials won a **trade dress injunction against N2G**.

The False Advertisements place the phrase "6 Hour" in quotation marks five times to emphasize that it is a "6 Hour" shot that was enjoined.  This was purposefully, willfully, and intentionally done to falsely and deceptively indicate to the intended audience that Living Essentials won a trademark type injunction against "6 Hour" energy shots and not a trade dress injunction against a specific "6 Hour" energy shot manufactured by N2G.  The False

9

Advertisements then compound this action by failing to identify who was actually enjoined.  No mention is made of N2G at all, and even though Living Essentials mentions the District Court's Case Number, it was not an oversight that no mention or reference is made by Living Essentials to the specific Court involved or the parties that were enjoined.

Living Essentials was denied a preliminary injunction against N2G's use of the highly descriptive phrase "6 Hour Energy Shot" in connection with energy shots.  *See* Case No. 2:08-cv-10983-PDB-MJH, Document 28.  The Court's opinion took notice of the fact that N2G had produced evidence of three other manufacturers that use phrases that include the highly descriptive phrase "6 Hour" in connection with their energy shots.  As the R&R properly points out, the Court stated in the N2G case "[f]urthermore, Defendants have produced a variety of competing two-ounce energy drink products from different manufacturers that use phrases such as "7 Hour Energy Boost," "6 Hour Energy!," "Extreme Energy Six Hour Shot," and "6 Hour Power" - -  thus diluting the Plaintiff's potential claim that "5 Hour Energy" has a strong secondary meaning that particularly identifies its source."  *See* Case No. 2:08-cv-10983-PDB-MJH, Document 28, Page 8.

Thus, N2G was <u>only enjoined</u> from using the <u>trade dress</u> it was using in connection with its 6 Hour Energy Shot and not from using the phrase 6 Hour Energy Shot.  *See* Case No. 2:08-cv-10983-PDB-MJH, Document 28, Page 8.  As such, the <u>truth</u> is that Living Essentials won a decision against N2G based on having demonstrated a "protected overall product image," commonly referred to as trade dress.  Living Essentials did not win a decision against a "6 Hour" shot as falsely stated in the False Advertisements and certainly not against any other "6 Hour" distributors, but rather won a decision against N2G's use of a overall product image (i.e. - the bottle label) that was confusingly similar to Living Essentials' overall product image.

Living Essentials' False Advertisements: 1) never refer to the enjoined parties by name (*i.e.* - N2G Distributing, Inc. and Alpha Performance Labs); 2) never mention the terms "trade dress," "package image," "label," "packaging," "product image," or any other terms that would <u>truthfully</u> identify what the injunction actually covered;  3) never refer to N2G's product in quotation marks as the "6 Hour Energy Shot," as referred to in the Court's opinion, and as actually used by N2G on its bottle label; 4) place the phrase "6 Hour" in quotation marks five times when referring to the enjoined product; 5) never state that the decision was based on a product that was labeled in a confusingly similar manner to their product; 6) do not provide an image of the enjoined product; 7) do not provide the UPC code of the product enjoined, 8) never state that the injunction only applies to N2G; and 9) incredibly instruct people to return **any** "6 Hour" shot.  Living Essentials' False Advertisements lump together all "6 Hour" shot manufacturers and distributors, including BDI, never explaining truthfully that the injunction only applied to N2G and only to trade dress issues.

In summary, Living Essentials' False Advertisements clearly contain literally false statements that have a tendency to deceive, and in fact did deceive a substantial portion of the intended audience.  As such, the R&R is correct in that this factor favors issuance of a preliminary injunction enjoining Living Essentials from issuing any further false and misleading statements that imply that BDI's products is subject to a court ordered injunction.

        **b.**    **Living Essentials' False Advertisements Actually Deceived and Tend to Deceive a Substantial Portion of the Intended Audience**

Living Essentials' argument that there is "no" evidence that demonstrates that a substantial portion of the intended audience was deceived does not even pass the red face test.

11

### i. 90% of BDI's Surveyed Brokers Submitted Evidence of Being Deceived

BDI's brokers and customers of BDI's brokers were deceived by Living Essentials' False Advertisements. *See* Exhibit H, Broker Declarations. **Nine** out of **ten** brokers that BDI contacted about signing declarations in support of BDI's preliminary injunction voluntarily did so. *See* Exhibit F, King Declaration ¶ 5. Despite Living Essentials claims to the contrary, this demonstrates that an enormous percentage of BDI's brokers, and customers of BDI's brokers, were in fact deceived by Living Essentials' False Advertisements[3].

### ii. BevNET.com Article

### "ENERGY SHOT DISPUTE CONFUSES RETAILERS"

The title of the article alone, **ENERGY SHOT DISPUTE CONFUSES RETAILERS**, which appeared on BevNET.com, speaks volumes of the substantial amount of confusion that occurred in the market as a result of the False Advertisements. *See* Exhibit I, BevNET.com Article. BevNET is a recognized authority on the beverage industry and is an internationally-recognized resource for beverage industry professionals and consumers. Living Essentials' False Advertisements caused so much confusion in the industry that Matt Casey, a Staff Writer for BevNET, on his own initiative decided to write an article about the dramatic amount of confusion that resulted in the industry as a result of Living Essentials' False Advertisements. This also clearly and emphatically demonstrates that a substantial number of retailers were confused by the False Advertisements further supporting BDI's claim for relief.

---

[3] See *Novartis Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharma. Co.*, 290 F.3d 578, 594 (3rd Cir. 2002)(upholding a district court decision granting preliminary injunctive relief where 15% of those surveyed were deceived by false advertisements indicating that it "demonstrates a likelihood of *substantial consumer confusion.*")(emphasis added)

### iii.     CSP Refused to Print the Legal Notice

Living Essentials' own documents also prove that the False Advertisements were false and misleading.  CSP (Convenience Store / Petroleum), a magazine that provides news and information on the convenience store, gas station, car wash and petroleum industries, refused to publish Living Essentials' press release as written in the June 2008 issue of their magazine.  *See* Exhibit J[4].  As clearly indicated in Exhibit J, Tom Corcoran, Regional Sales Manager at CSP Information Group, in an email to Lynn Petersmarck of Living Essentials dated May 23, 2008, indicates that CSP's publisher is requesting a change to the ad.  As the email states:

> Jim (SVP, Publisher) is fine with running the ad but is asking that a small change is made.  As you are probably aware the company is mimicking 5-Hour is Nitro 2.  NVE sued them as well and since NVE has a 6-hour energy product a distinction should be made.  Since the company is Nitro 2 and not NVE for this mandate it is possible to add Nitro 2 within 6-hour.
>
> Please let me know your thoughts.

*See* Exhibit J.  Obviously, CSP's publisher had a problem with the legal notice that Living Essentials wanted to place in CSP magazine.  More specifically, CSP's publisher wanted Living Essentials to clearly identify the manufacturer of the product (N2G is referred to in the industry as Nitro 2) that was enjoined by the Court because he feared that the advertisement, as written, would cover N.V.E.'s 6 Hour Power energy shot, a product falling under the "6 Hour" energy shot category.  Living Essentials refused to make the change so the ad did not run.

### iv.     7-Eleven Questions the Soundness of Living Essentials' Methodology

Just as telling is an email Living Essentials received from Sandra Colvin, a Category Manager for 7-Eleven, Inc.  *See* Exhibit K.  In the email, Sandra Colvin states:

---

[4] Although these emails were initially designated as "Confidential Attorney's Eyes Only" by Living Essentials, on November 24, 2008, in an email from Living Essentials' counsel to BDI's counsel, this designation was removed.

13

> Rise, Dempsey - I called the 248-960-1700 x 217 letter and operator directed me
> to "Emmitt" so I left a vm to please call me.  This letter has gone out to our stores.
> But I question the process.  There aren't any UPC's to direct the product pull.
> This is not the way to handle a product pull at our stores.  They will not do it
> unless they hear from me.
>
> Thom - Is this sound for Living Essentials to ask us to pull the product of another
> vendor?

*See* Exhibit K.  As set forth above, clearly Ms. Colvin did not know what "6 Hour" product to pull after receiving Living Essentials recall letter.  She also questions the manner in which Living Essentials went about the recall process noting that the recall letter doesn't provide the UPC's that would identify the actual product.  Again, this further demonstrates that the False Advertisements were false and misleading.

### v.     Convenience Store Manager Refuses Samples Because of False Advertisements

As further evidence of the disruption that occurred because of the False Advertisements, Laura King, Vice President of BDI, was attending an INDY PRIDE event in which free samples of the MINI THIN RUSH® product were being offered in an effort to promote the product.  At this event, a convenience store manager who had seen Living Essentials' False Advertisements refused to take a free sample believing it to be the subject of a court ordered recall because there was something wrong with the product.  *See* Exhibit E, King Declaration ¶ 11.  As if this wasn't bad enough, several people around the booth overheard this and appeared alarmed by his statements.  *Id.*

Despite Living Essentials' assertions to the contrary, as Magistrate Pepe properly found in the R&R, BDI has demonstrated by an **overwhelming** amount of evidence that the False Advertisements tend to deceive, and in fact did deceive, a substantial portion of the intended audience.  As such, this factor also highly favors issuance of the preliminary injunction.

14

### c.     Living Essentials' False Statements are Material

As Magistrate Pepe properly found in the R&R, a deceived consumer is not going to purchase a product that it has falsely been led to believe is the subject of a court ordered recall. This is especially true for products that are made for human consumption. As set forth above, clearly the convenience store manager who was attending the INDY PRIDE event falsely believed that BDI's products were the subject of the court ordered recall and would not even take a free sample, let alone purchase the product because of the issues surrounding the purported recall. This is despite repeated assurances from Ms. King that the product was not subject to the recall. *See* Exhibit E, King Declaration ¶ 11. Further, contrary to Living Essentials' assertions, BDI had products returned as a result of the False Advertisements as has been documented to Living Essentials. *See* Exhibit F, King Declaration ¶ 7.

Living Essentials' makes unfounded assertions that market factors were the cause of BDI's lower sales. In fact, Living Essentials' own evidence submitted with their objection to the R&R support the conclusion that market factors were not the cause. *See* Plaintiff's Objections to Magistrate's Report and Recommendation, Exhibit 7. Prior to the release of the False Advertisements, Nielsen reported that Living Essentials' sales for the four (4) weeks ending on May 17, 2008 were $9,757,610. Yet, by the four (4) weeks ending on August 9, 2008, Living Essentials' sales jumped to $13,529,938. This represents an increase in sales of almost 28% after the False Advertisements were released. This increase in sales is a direct result of Living Essentials' False Advertisements as sales were diverted from BDI, as well as other "6 Hour" shot manufacturers, to Living Essentials. Obviously, the False Advertisements worked as they were intended.

Once again, as the R&R properly held, this factor also is decisively in favor of the issuance of an injunction against Living Essentials.

> **d.      Living Essentials' False Advertisements Were Introduced Into Interstate Commerce**

Living Essentials' does not, and cannot, dispute that the False Advertisements were introduced into interstate commerce.  As such, as properly found in the R&R, this factor also falls decisively in BDI's favor.

> **e.      There is a Causal Link Between the Challenged Statements and Harm to BDI**

Living Essentials' False Advertisements is causing brokers, distributors and customers to falsely believe that BDI's MINI THIN RUSH® is the subject of a court ordered recall.  Further, the False Advertisements are causing other individuals to falsely believe that there is something wrong with BDI's product because it is subject to a recall.  As such, BDI's business has been and continues to be unfairly disrupted by having to deal with brokers, distributors, and retailers who falsely believe that BDI's products are subject to a court ordered recall.  Clearly there is a causal link between the False Advertisements and the harm being done to BDI.

> **2.      BDI Has and Will Continue to Suffer Irreparable Injury Without an Injunction**

Living Essentials now takes the inconsistent position that BDI has not and will not continue to suffer irreparable injury without an injunction. This is not what Living Essentials' argued in the N2G case when its alleged trademark and trade dress rights were being violated by N2G[5].

---

[5] As the Sixth Circuit has stated, the doctrine of judicial estoppel forbids a party "from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding."  See *Teledyne Indus., Inc. v. National Labor Relation Board*, 911 F.2d 1214, 1217-1218 (6th Cir. 1990).

BDI's MINI THIN RUSH® product has been falsely associated with a court ordered recall by Living Essentials' conduct. It is unconscionable to allege that BDI has not, and will not, continue to suffer irreparable injury as a result of its product being falsely associated with a court ordered recall. Any reasonable businessperson, as well as consumers, would not purchase a product that they falsely believe is subject to a recall. Recalls, by their very nature, tarnish a product's image as well as the company that manufactures the product. Recalls imply that there is something wrong with a product. This is especially true given that the product at issue, BDI's MINI THIN RUSH®, is designed for human consumption. Living Essentials would clearly not want their products associated with a recall and would obviously be arguing the opposite to this Court if it were the case.

As Living Essentials itself argued in the N2G case, courts have long adopted a presumption that irreparable injury arises from Lanham Act violations. *See e.g. Time Warner Cable Inc. v. DirectTV Inc.*, 497 F.3d 144, 161-162 (2d Cir. 2007); *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006). As the R&R properly held, this Court has previously held that it should presume irreparable harm where a plaintiff demonstrates false or misleading advertising in violation of the Lanham Act. *See e.g. - Mexican Food Specialties Inc. v. Festida Foods Ltd.*, 953 F. Supp. 846, 854 (E.D. Mich. 1997); *Janda v. Riley-Meggs Indus., Inc.*, 764 F. Supp. 1223, 1229 (E.D. Mich. 1991). Moreover, the Sixth Circuit holds that:

> "A finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears." (citations omitted) The irreparable injury flows "both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values ..."

*See Wynn Oil Co. v. American Way Serv. Corp*. 943 F.2d 595, 608 (6th Cir. 1991).  As such, as the R&R properly held, this Court should presume that irreparable harm exists because of the confusion caused by Living Essentials' deceptive and unfair acts.

BDI's reputation and goodwill in the industry has been and is being irreparably damaged by Living Essentials' False Advertisements because BDI's products reputation in the trade is being tarnished as falsely being the subject of a court ordered recall.  In addition, BDI's business reputation and goodwill in the industry has been and is being damaged by Living Essentials' False Advertisements.  BDI has and will also to continue to suffer negative economic consequences as a result of Living Essentials' conduct complained of herein.  *See also Lorillard,* 453 F.3d at 382 (holding also that "irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears from infringement or unfair competition.").

Living Essentials also argues that BDI's motion is moot because time has passed since the issuance of the False Advertisements and BDI issued a corrective advertisement.  Once again, Living Essentials misses the point.  BDI should not be denied a preliminary injunction simply because time has passed since the False Advertisements were issued.  BDI promptly requested this Court for injunctive relief and, as set forth above, Living Essentials' alleged assertion that it does not "intend" to publish the False Advertisements again does not render BDI's claims for relief moot.  As the R&R also properly noted, as part of the relief requested by BDI, and granted in the R&R, BDI also requests that Living Essentials take corrective measures to clear up the false beliefs and confusion that have been created in the marketplace as a result of the False Advertisements.

Lastly, BDI should not be punished and denied relief for issuing an advertisement on its own that attempted to alleviate some of the confusion caused by the False Advertisements.  As

the Sixth Circuit has properly held in the context of damage control by the injured, "[t]his rule recognizes that it is unreasonable to expect a businessperson faced with a Lanham Act violation to sit idly by until a customer manifests actual confusion.  The law should encourage quick responses and the mitigation of damage, and should not require parties to suffer an injury before trying to prevent it." *Balanced Dynamics Corp. v. Schmitt Indus. Inc.*, 204 F.3d 683, 691 (6th Cir. 2000).  Likewise, BDI should not be denied relief for trying to, in part, mitigate the damage caused by Living Essentials' False Advertisements.  Living Essentials does not want to correct the damage done as a result of its False Advertisements because Living Essentials has and is continuing to directly profit from its unfair trade practices.

### 3.    Issuance of the Injunction Will Not Cause Substantial Harm to Others

As Magistrate Pepe properly found in the R&R, Living Essentials has failed to demonstrate a legitimate purpose to allow it to continue to use the misleading False Advertisements.  No other parties other than BDI and Living Essentials will be affected by the issuance of an injunction.

### 4.    The Public Interest Is Served by Truthful Advertising

As properly set forth in the R&R, there is a public interest in "preventing confusion and deception in the marketplace and protecting the trademark holder's property interest in the mark." *Lorillard Tobacco Co.*, 453 F.3d at 383.  The public interest is served by "fair competitive practices and clearly opposed to being deceived in the marketplace." *Estate of Presley v. Russen*, 513 F. Supp. 1339, 1382 (D. N.J. 1981).  As such, the R&R is correct that this factor favors entry of a preliminary injunction enjoining Living Essentials' unfair trade practices.

19

**D.    Bond**

Living Essentials points out that the R&R fails to address the issue of a bond.  BDI is of the position that a bond is not necessary in this case because Living Essentials will not be found to be wrongfully enjoined.  In any event, it was not necessary for Magistrate Pepe's R&R to address the issue of a bond, as this Court can address that issue when formally adopting the R&R.  Any bond that BDI should be required to post should be extremely low due to the negligible chance that Living Essentials will sustain any purported damage by being enjoined from reissuing the False Advertisements and the corrective advertisements.

**IV.    CONCLUSION**

For the foregoing reasons, this Court should adopt Magistrate Pepe's R&R and grant a preliminary injunction as outlined in the R&R.

Date:  November 25, 2008                    Respectfully submitted,

                                            **Body Dynamics, Inc.**

                                            /s/ Deborah J. Swedlow_____
                                            J. Michael Huget - P39150
                                            Deborah J. Swedlow - P67844
                                            BUTZEL LONG
                                            350 South Main Street, Suite 300
                                            Ann Arbor, MI  48104

                                            Telephone:  (734) 213-3628
                                            Facsimile:  (734) 995-1777

                                            Email:  huget@butzel.com
                                                    swedlow@butzel.com

                                            Dean E. McConnell
                                            Scott S. Morrisson
                                            **KRIEG DEVAULT LLP**
                                            One Indiana Square, Suite 2800
                                            Indianapolis, Indiana 46204

                                            Telephone:  (317) 636-4341
                                            Facsimile:  (317) 636-1507

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2008, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent to the following parties by operation of the

Court's electronic filing system.  Parties may access this filing through the Court's system.

Mark A. Cantor
Marc Lorelli
Thomas Cunningham
Brian Doughty
1000 Town Center - 22nd Floor
Southfield, Michigan  48075

Email:  mcantor@brookskushman.com
          mlorelli@brookskushman.com

/s/ Deborah J. Swedlow_____
J. Michael Huget
Deborah J. Swedlow
BUTZEL LONG
350 South Main Street, Suite 300
Ann Arbor, MI  48104

Telephone:  (734) 213-3628
Facsimile:  (734) 995-1777

Email:  huget@butzel.com
          swedlow@butzel.com

KD_IM-1844417_1.DOC

21